```
1                    IN THE UNITED STATES DISTRICT COURT
                     FOR THE NORTHERN DISTRICT OF TEXAS
2                              DALLAS DIVISION

3
    RONALD C. PEARSON,             )   Case No. 3:08-CV-01327-O
4                                  )   (Related Case 3:06-CR-00369-O-1)
             Petitioner,           )
5                                  )   Dallas, Texas
    v.                             )   December 4, 2008
6                                  )   9:00 a.m. Docket
    UNITED STATES OF AMERICA,      )
7                                  )
             Respondent.           )   EVIDENTIARY HEARING
8                                  )
    _____)
9
                       TRANSCRIPT OF PROCEEDINGS
10               BEFORE THE HONORABLE JEFF KAPLAN,
                 UNITED STATES MAGISTRATE JUDGE.
11
    APPEARANCES:
12
    For the Petitioner:           Kevin Joel Page
13                                FEDERAL PUBLIC DEFENDER-DALLAS
                                  525 Griffin Street, Suite 629
14                                Dallas, TX  75202
                                  (214) 767-2746
15
    For the Respondent:           Marc W. Barta
16                                U.S. ATTORNEY'S OFFICE
                                  1100 Commerce Street, Third Floor
17                                Dallas, TX  75242
                                  (214) 659-8645
18
    Transcription Service:        Kathy Rehling
19                                209 Bay Circle
                                  Coppell, TX  75019
20                                (972) 304-1998

21

22

23

24
                  Proceedings recorded by electronic sound recording
25                 transcript produced by transcription service.
```

1          <u>DALLAS, TEXAS - DECEMBER 4, 2008 - 9:00 A.M.</u>

2          THE COURT:  This is Cause No. 3:08-CV-1337 [*sic*],

3     United States versus Ronald Pearson.  We're here on an

4     evidentiary hearing on the Defendant's Section 2255 motion.

5       Mr. Barta, is the Government ready to proceed?

6          MR. BARTA:  I am, Your Honor.

7          THE COURT:  Mr. Page, is the Defendant ready?

8          MR. PAGE:  It is.  I am.

9          THE COURT:  How many witnesses do we have?

10          MR. PAGE:  From Movant, two.

11          THE COURT:  Two?  Mr. Barta, from the Government?

12          MR. BARTA:  One, and potentially another one, but

13     probably just one witness, Your Honor.

14          THE COURT:  All right.  Mr. Barta?  Oh, I'm sorry.

15     Mr. Page, you may call your first witness.

16          MR. PAGE:  Your Honor, before we do that, I wanted

17     to apprise the Court of a difference of opinion between the

18     parties about the scope of the petition, and consequently the

19     scope of the hearing today.

20          THE COURT:  Okay.

21          MR. PAGE:  The parties differ about whether or not

22     the petition fairly raises as a separate ground of

23     ineffective assistance the Defendant relied at the polygraph

24     hearing --

25          THE COURT:  I think it does.

1          MR. PAGE:  Okay.

2          THE COURT:  And I do want to hear evidence on that.

3          MR. PAGE:  Okay.  Thank you, Your Honor.

4          THE COURT:  All right.  I mean, if you want to

5   present evidence on that, I'm happy to hear evidence on that.

6          MR. PAGE:  All right.  Thank you, Your Honor.  And I

7   would ask whether the Court would be amenable to a motion to

8   amend the pleadings just to clarify that position.

9          THE COURT:  I think that -- I don't see how the

10  Government could contend otherwise, since they addressed it

11  in their response.

12      I mean, Mr. Barta, is there some objection there?

13         MR. BARTA:  I have no objection to considering it

14  today, Your Honor.

15         THE COURT:  Okay.  I mean, it's --

16         MR. PAGE:  Thank you, Your Honor.

17         THE COURT:  I think it's fairly raised.

18         MR. PAGE:  Okay.  At this point, I would request

19  that -- invoke the Rule, not as to Mr. Yanowitch, but as to

20  Mr. Taylor and the second witness, Mr. Smith.

21         THE COURT:  Okay.  Well, let's hear from Mr. Taylor

22  first.

23         MR. PAGE:  Okay.

24         THE COURT:  And is Mr. Smith in the courtroom?  Tell

25  me who Mr. Smith is.

1          MR. PAGE:  Mr. Smith is a friend of Movant who might

2     be relevant about whether or not he was interested in

3     appealing prior to his sentencing.

4          THE COURT:  Okay.  Mr. Smith, if you'd adjourn to

5     the hallway, we'll call you when we need you.

6          MR. PAGE:  Does the Court want me to -- wants me to

7     examine Mr. Taylor rather than Mr. Pearson?

8          THE COURT:  I'd like to hear from Mr. Taylor first.

9          MR. PAGE:  Okay.

10          THE COURT:  Unless that really messes you up.

11          MR. PAGE:  Not at all.

12          THE COURT:  Okay.

13          MR. PAGE:  I'd call Mr. Taylor.

14          THE COURT:  Mr. Taylor, if you'd come forward,

15     please.

16            RANDY TAYLOR, PETITIONER'S WITNESS, SWORN

17          THE COURT:  You may be seated up here.

18       You may proceed.

19          MR. PAGE:  Thank you.

20                     DIRECT EXAMINATION

21     BY MR. PAGE:

22     Q    Good morning.  Could you state your name for the record,

23     please?

24     A    I'm sorry?

25     Q    Could you state your name for the record, please?

1  A    Randy Taylor.

2  Q    Okay.  If there's anything I say that you don't

3  understand, please let me know.  I can have a tendency to

4  mumble.

5  A    All right.

6  Q    Thank you.  Do you know Ron Pearson?

7  A    I do.

8  Q    Okay.  How do you know Mr. Pearson?

9  A    As an attorney.

10  Q    Okay.  Did you represent Mr. Pearson in a criminal case?

11  A    I did.

12  Q    Okay.  And what was the nature of that case?

13  A    A child pornography charge.

14  Q    Okay.  Mr. Taylor, have we ever met before today?

15  A    No.

16  Q    Okay.

17  A    Not to my knowledge.

18  Q    Have you been to your office in the last month or so?

19  A    Yes.

20  Q    Yes?  Did you have a -- receive a message that I had

21  called on the telephone?

22  A    Yes.

23  Q    Did you have a chance to return that call?

24  A    Yes.

25  Q    You returned a call to me?

1  A    No.

2  Q    Thank you.

3  A    You said if I needed to talk to you.

4  Q    Okay.

5  A    I didn't need to talk to you.

6  Q    Okay.  Do you recall a meeting with Mr. Pearson

7  immediately after his sentence?

8  A    Say that again, please.

9  Q    Do you recall a meeting that you'd had with Mr. Pearson

10  immediately after he was sentenced?

11  A    Do I recall a meeting after he was sentenced?  Yes.

12  Q    Okay.  Why do you meet with clients immediately after you

13  were sentenced, or why did you meet with Mr. Pearson on that

14  day?

15  A    Because that's what lawyers do, is talk with their

16  clients to answer any questions they have and discuss the

17  case with them.

18  Q    Okay.  What in particular did you discuss with Mr.

19  Pearson that day?

20  A    There's an attorney-client privilege here.

21         THE COURT:  I'm sure Mr. Pearson is happy to waive

22  that privilege.  Correct, Mr. Page?

23         MR. PAGE:  Yes, Your Honor.

24  BY MR. PAGE:

25  Q    Okay.  What did you discuss with Mr. Pearson at that

1  meeting?

2  A    It was just a general discussion.  I don't remember

3  anything specifically being discussed, just I -- well, I take

4  that back.  I do remember that we focused on how much time 70

5  months would mean he would be incarcerated.  That seemed to

6  be the principal gist of the conversation, how much time he'd

7  have to do in the FCI.

8  Q    Okay.  Do you frequently meet with your clients after

9  they're sentenced, immediately after they're sentenced in the

10  courtroom?

11  A    Yes.

12  Q    Okay.  Do you do that to discuss an appeal, the status of

13  a notice of appeal?  Generally?

14  A    If they want to appeal, sure.

15  Q    Okay.  Did Mr. Pearson discuss an appeal at that time?

16  A    Not that I specifically remember.

17  Q    Okay.  Is it possible that you've forgotten?

18  A    Anything's possible.

19  Q    Okay.  Can you -- do you think you forgot?

20  A    No.

21  Q    Okay.

22  A    Appeal was not a primary purpose of our conversation,

23  I'll tell you that.

24  Q    Okay.  Could it have been a secondary or tertiary --

25  A    Well, it may have been something that we -- I mean, I --

Taylor - Direct                              8

1   the conversation -- I don't remember how long the

2   conversation was.  Probably twenty or thirty minutes.  And it

3   may have -- there may have been one or two sentences or one

4   or two questions.  But I don't recall anything being said

5   about an appeal.

6        We were happy with the sentence.  I mean, when I say

7   happy, I was happy with the sentence because I got his

8   Guidelines from 135 months down to 70 months.  And although

9   he was disappointed that he didn't get probation, he got as

10  good a sentence as we could have hoped for, considering the

11  charges.

12  Q   Okay.  Your affidavit states that you make your living as

13  a criminal defense attorney and would have been happy to take

14  an appeal.  Is that your testimony today?

15  A   Sure.

16  Q   Okay.  What was the last federal criminal appeal you

17  filed?

18  A   It was -- I was going to argue the last federal criminal

19  appeal I filed.  The name escapes me of my client right now.

20  But it was -- when we had the storm down in New Orleans, not

21  the hurricane but the storm this year, earlier this year, I

22  was -- I had made arrangements to go down.  It's Sheri --

23  Sheri -- I don't remember her last name right now.

24  Q   Okay.

25  A   But it was when we had the bad storm down there.

1    Sometime around the middle of the year.

2    Q    Okay.   Would it surprise you to learn that your name does

3    not appear in a PACER search of the Fifth Circuit?

4    A    Say that again, please.

5    Q    Would it surprise you to learn that your name does not

6    appear in a PACER search of the Fifth Circuit?

7    A    I'm not getting the last part of that question.

8    Q    Would it surprise you to learn that the electronic docket

9    of the Fifth Circuit does not reveal any cases in your name?

10   A    Yes.

11   Q    That would surprise you?

12   A    Yes.

13   Q    Okay.   Were you hurting financially at the time of the

14   Defendant's sentencing?

15          MR. BARTA:   I'm going to object to the relevance of

16   that, Your Honor.

17          THE COURT:   What does that have to do with anything?

18          MR. PAGE:   Well, the witness indicated in his

19   affidavit that he would have been happy to take the appeal in

20   order to make money.   The point I'm trying to make is that

21   sometimes a client can be more trouble than the money is

22   worth for the lawyer.   That he --

23          THE COURT:   Sustained.

24          MR. PAGE:   Okay.

25   BY MR. PAGE:

1  Q   All right.  Is it possible that you simply forgot Mr.

2  Pearson's request or that you failed to process his request

3  at the time?

4  A   Is it possible?

5  Q   Yes, sir.

6  A   I remember nothing being discussed about an appeal.

7  Q   All right.  Were you ill at the time of your

8  representation of Mr. Pearson?

9  A   Was I what?

10  Q   Were you ill?

11  A   The last word?

12  Q   Were you ill?

13  A   Ill?

14  Q   Yes, sir.

15  A   I have cirrhosis of the liver, which is a chronic

16  illness.

17  Q   Was that condition affecting you at the time of your

18  representation?

19  A   Well, yes, to the extent that anybody with cirrhosis --

20  I'm on the liver transplant list, and I have to take

21  medication for it every day.  And a lot of medication.  And I

22  have to go to a doctor, I don't know, several times a year.

23  I have a liver doctor that sees me.  So, yes, I have a

24  chronic illness, if that's the question.

25  Q   Were you suffering from this illness at the time of the

1  representation?

2  A   I have been -- I have had cirrhosis of the liver since --

3  it's been diagnosed since 2003.

4  Q   Did this condition or any other circumstance at the time

5  of the representation affect your mental acuity?

6  A   Not to my knowledge.

7  Q   Were you having difficulty remembering names at the time

8  of the representation?

9  A   I have trouble remembering -- I have trouble remembering

10 your name right now.

11 Q   Did you have difficulty remembering AUSA Yanowitch's name

12 at the time of the representation?

13 A   I did.  Mr. Yanowitch has a name that I'm not familiar

14 with.  When I say that, I remember names by association, by

15 thinking of somebody else whose name I've known that has the

16 same name as the person whose name I'm trying to remember,

17 and I don't know any Mr. Yanowitches down here in Texas.

18 They all seem to be up north.

19 Q   All right.  On two separate occasions in the

20 representation, you failed to appear to an office building in

21 Las Colinas in which Mr. Pearson was scheduled for a

22 polygraph.  Is that correct?

23 A   No.  That's not correct.

24 Q   Okay.  On -- do you recall that -- were there two

25 occasions in which the Defendant was scheduled to appear for

1   a polygraph?

2   A    Yes.

3   Q    Okay.  On the first occasion, did you succeed in locating

4   the building?

5   A    It's in my affidavit.  Let me -- let me refresh my

6   recollection.  Please.

7        (Pause.)

8   A    No, I did not.

9   Q    Okay.  On the second occasion that the polygraph was --

10  was there a second occasion the polygraph was scheduled?

11  A    Yes.

12  Q    Did you succeed in locating the building on that day?

13  A    Yes.

14  Q    Did you succeed in locating the building on time?

15  A    I was ten minutes late, and Mr. Hudson told me that my

16  client had already -- that Mr. Pearson had already left and

17  didn't want to do the polygraph.

18  Q    Do you recall the time that this meeting was scheduled?

19  A    No.  It was sometime in the morning, in the a.m., as I

20  recall.

21  Q    Okay.  And your recollection is that you showed up that

22  morning?

23  A    Yes.

24  Q    Okay.

25  A    I spoke with Mr. Hudson, Mr. Yanowitch's -- well, it

1    wasn't his assistant.  He was a government agent himself.

2    Q    Did you make contact with your client that day, when you

3    showed up?

4    A    I believe I did.

5    Q    Okay.  Did you -- you made contact with him but he had

6    already left the building.  Is that correct?

7    A    I -- well, the first question was did I make contact with

8    him that day.  Yes.  I believe I did make contact with him

9    that day.

10   Q    Did you make contact with him in Las Colinas?

11   A    No.  He had already left by the time I got there.

12   Q    Do you recall losing your truck that day?

13   A    Yes.

14   Q    Okay.  Do you recall looking around Las Colinas for your

15   truck that day?

16   A    Okay.

17   Q    Did you succeed in locating your truck after you parked

18   it?

19   A    Later on.

20   Q    Okay.  So it took you a while to find your truck?

21   A    Right.

22   Q    Okay.

23   A    I'm not familiar with the Las Colinas area at all.

24   Q    How long did you look for your truck?

25   A    Several days.

Taylor - Direct                    14

1  Q    Okay.  On the first occasion when you came to Las

2  Colinas, or you were unable to reach Las Colinas, were you

3  having difficulty remembering the directions?

4  A    No.  As a matter of fact, I wasn't.  And the reason I say

5  that is that my client, Mr. Pearson, told me that if I would

6  go to the first IHOP or something like that, it would be --

7  the IHOP was -- and when I say IHOP, it could have been some

8  other restaurant, but it was a fast-food-type restaurant --

9  but it would -- that was a landmark and the building I was

10 looking for would be right after that landmark, and that

11 direction was not accurate.

12 Q    Okay.  So your testimony is that the client's -- that you

13 --

14 A    The directions he gave me.  Because I didn't know

15 anything about Las Colinas.  And Las Colinas gets out there

16 and it winds around and up and down and golf courses and all

17 of that.  I just didn't know Las Colinas.

18 Q    Did -- before you embarked on the journey, did you

19 anticipate that locating the building might be a difficulty

20 for you?

21 A    No, because Mr. Pearson's instructions about how to find

22 the building was very specific.

23 Q    At that time, did you -- in your life, did you encounter

24 difficulty finding unfamiliar locations?

25 A    I'm sorry.  Say that again.

 1  Q   At that time in your life, did you frequently encounter

 2  difficulty finding unfamiliar locations?

 3  A   Not particularly.

 4  Q   Okay.  Did you take any measures to independently

 5  determine where you needed to go, other than the directions

 6  provided to you by your client?

 7  A   No, because there's no street map or MAPSCO of Las

 8  Colinas that I have, to the best of my knowledge.  I've got

 9  one of Dallas.  But the building doesn't even have the number

10  on it.  Like the numbers -- I'm going to make one up -- is

11  550.

12  Q   Uh-huh.

13  A   It doesn't have 550 on the building.

14  Q   Okay.  Is it your testimony that you don't believe that

15  there are maps of Las Colinas?

16  A   I didn't have access to one, didn't know about one,

17  didn't -- wasn't aware of one.

18  Q   Okay.  Could you have used the Internet to determine the

19  location of the -- of Las Colinas?

20  A   I can't turn a computer on.

21  Q   Okay.  Did you know that this polygraph could be an

22  important event in the case before you left?

23  A   Important to me?

24  Q   Important to Mr. Pearson.

25  A   Mr. Yanowitch and Mr. Hudson, to me, seemed like that

 1  they were just more or less offering him a polygraph.  I

 2  didn't get the impression at all that it would be an earth-

 3  shattering conclusion to the situation that Mr. Pearson was

 4  in.  I never did get -- everybody seemed kind of, well, let's

 5  go do the polygraph, but we're not going to -- it's not

 6  something that we just have to do or want -- want to

 7  particularly do.  I never did get that impression.

 8  Q   In the sentencing hearing before Judge Buchmeyer, you

 9  presented an expert regarding Mr. Pearson's future danger to

10  the community.  Isn't that true?

11  A   Yes, sir.

12  Q   And that expert was cross-examined at some length about

13  the ability of him to make that -- to render that opinion in

14  light of the fact that no polygraph had been performed.

15  Isn't that correct?

16  A   I don't specifically remember whether or not that's true.

17  I don't specifically remember, but -- but that's all I can

18  say.

19  Q   Okay.  I guess the transcript will speak for itself, but

20  did you anticipate that this might be a problem in the

21  presentation of this expert?

22  A   Whether or not he had been polygraphed about the

23  dangerousness?  I don't understand the question.

24  Q   Did you anticipate that Mr. Pearson's failure to take a

25  polygraph might be used to undermine the testimony of the

1  expert that you presented on Mr. Pearson's behalf?

2  A   No.

3  Q   Okay.  Is it your testimony that Mr. Yanowitch was

4  offering -- offered Mr. Pearson a polygraph?  In other words,

5  was it Mr. Yanowitch's idea?

6  A   I can't say who originally brought the idea up.  Early on

7  in the -- my representation of Mr. Pearson, Mr. Yanowitch

8  suggested to me that he thought there might be other

9  problems, and I just don't remember from there.  I know that

10 Mr. Pearson was adamant about not having done this type of

11 thing before, and that was primarily the reason I wanted the

12 polygraph, to show that this was a first-time experience for

13 him.

14 Q   In fact, --

15 A   But later on, because of a trip to the Philippines, I

16 began to feel somewhat different.

17 Q   Okay.  Well, the purpose of the trip to the Philippines

18 was in order to dispel concerns that Mr. Pearson might have

19 molested another child, or molested a child.  Is that

20 correct?

21 A   Well, Mr. Yanowitch, when I first met him, or towards the

22 beginning of our relationship in this, him being the United

23 States Attorney, Assistant United States Attorney and me

24 being the defense lawyer, suggested that they thought a

25 possum was in the henhouse about him going to the Philippines

 1   so much.  That's an old country expression.

 2   Q    Okay.

 3   A    Entirely.

 4   Q    So that dispelling that doubt was important enough to you

 5   that you were willing to travel all the way to the

 6   Philippines.  Is that correct?

 7   A    That's correct.

 8   Q    Okay.

 9   A    And at my own expense, I might add.

10   Q    Okay.  And the polygraph was also a part of your strategy

11   to dispel that doubt.  Is that correct?

12   A    Yes.

13   Q    Was there any strategic reason not to show up for the

14   polygraph?

15   A    No.

16   Q    Okay.

17   A    I show up for what I say I'm going to do.

18   Q    Okay.  At the time of this representation, what was your

19   impression of Mr. Pearson?

20   A    My overall impression?

21   Q    Yes, sir.

22            MR. BARTA:  I'm going to object to the relevancy of

23   that, Your Honor.

24            THE COURT:  Sustained.

25            MR. PAGE:  All right.

```
 1  BY MR. PAGE:
 2  Q    Did you consider Mr. Pearson to be sort of a high-
 3  maintenance client?
 4  A    I don't understand the question.
 5  Q    Did -- how many times did you meet with Mr. Pearson?
 6  A    I'd say between a half a dozen and a dozen times.
 7  Q    Okay.  Were most of those on -- at his request or yours?
 8  A    I'd say the majority was his.
 9  Q    Okay.  Did -- were there some times that he wanted to
10  meet with you, even though nothing had really changed in the
11  case?
12  A    Yes.
13  Q    Okay.  Did he seem to have unrealistic expectations of
14  you at some points?
15  A    Unrealistic expectations of me?
16  Q    Uh-huh.  Or of what you could do in the process.
17  A    I'm sorry?
18  Q    Or of what you could do for him in the case.
19  A    The pretrial release officer said to me that he had never
20  seen anybody in as much denial as Mr. Pearson was about his
21  situation.  And I believed that he was accurate in his
22  description of Mr. Pearson.
23       Mr. Pearson from the get-go would not accept the fact,
24  even though I told him, that there was an excellent chance
25  that he was going to go to the Federal Correctional Institute
```

1   for a period of time.  As a defense lawyer, you don't want to

2   think in negativity, or at least I don't, but I still -- Mr.

3   Pearson, I believe, really thought that he was going to get

4   probation.  And he talked with my staff about getting

5   probation and how much the pretrial release officer liked him

6   and what he was doing to help his situation with the pretrial

7   release officer.

8        And in all fairness to Mr. Pearson, Mr. Pearson did do

9   some things to help his situation.

10  Q    Did -- were there times that Mr. Pearson's expectations

11  of you caused arguments between you?

12  A    Caused what?

13  Q    Caused arguments between you.

14  A    We never argued.

15  Q    Okay.  Do you recall on any occasion walking out of the

16  courthouse with Mr. Pearson, Mr. Falcone, and Rex Smith?

17  A    I'm sorry?

18  Q    Do you recall any occasion on which you were walking out

19  of the courtroom in the company of Mr. Pearson, Rex Smith,

20  and Mr. Falcone?

21  A    Do I ever recall walking out of the courthouse with Mr.

22  Pearson and Mr. Smith at the same time?

23  Q    And Mr. Falcone.  Yes, sir.

24  A    Mr. who?

25  Q    And Mr. Falcone.  Mr. Falcon.  Did you --

1   A    Oh.   Oh, Mark Falcon.

2   Q    Yes, sir.

3   A    I'm sure we walked out of the courthouse together.

4   Q    Okay.   Do you recall any occasion on which -- in which

5   you raised your voice at Mr. Pearson?

6   A    No.

7   Q    Okay.   Did you review the presentence report with Mr.

8   Pearson?

9   A    Yes.

10   Q    Okay.   Did he write anything on the presentence report,

11   to your recollection?

12   A    Did he write anything on the report?

13   Q    Would be on a copy of the report.   Yes, sir.

14   A    He made voluminous, as I recall, voluminous notes about

15   the report.   Yes.

16   Q    Okay.   Did these --

17   A    I believe that he did, yes.

18   Q    Did these notes reflect a dissatisfaction with aspects of

19   the Guideline calculation?

20   A    With the Guidelines?

21   Q    Uh-huh.   Yes, sir.

22   A    I don't specifically remember if they did or not, but I

23   would have told him that the Guidelines are pretty much set

24   in concrete.

25   Q    Well, I mean, did he -- did any of these notes reflect

Taylor - Direct                                    22

1    dissatisfaction with the way that the probation officer had

2    calculated the Guidelines?

3    A    I don't recall that being the case.

4    Q    Okay.  What do you -- what did those notes pertain to,

5    then?

6    A    Well, what he had done.  The fact that he had sought

7    medical care or psychiatric care.  That he was a member of a

8    group.  That he had went to church and told his church

9    members that -- fellow parishioners that -- what he had done,

10   even though he didn't have to tell them that.  And just all

11   these things that were kind of counterpoints to what the

12   presentence investigation report showed.

13   Q    Can you exclude the possibility that some of these notes

14   pertained to specifically the probation officer's calculation

15   of the Guidelines?

16   A    Would you repeat that question, please?

17   Q    Can you exclude the possibility that some of Mr.

18   Pearson's notes reflected his dissatisfaction with the way

19   that the probation officer had calculated the Guidelines?

20   A    Can I exclude the possibility?  No, I can't.  He wrote me

21   a whole lot.

22   Q    Okay.  What did you tell Mr. Pearson, if anything, about

23   how his waiver of appeal impacted his right to appeal?

24   A    I don't recall us discussing the waiver of right to

25   appeal in any depth or -- as I said earlier, we were -- I was

Taylor - Direct                                    23

1  happy with the sentence.  He wasn't happy with the sentence.

2  But he understood that it was the best of all possible

3  worlds, or at least I thought he knew.

4  Q   So is it your testimony that you did not discuss the

5  waiver of appeal and a plea agreement with him?

6  A   I don't remember ever discussing a waiver of an appeal.

7  I wouldn't waive a client's rights without him being fully

8  cognizant of the fact.  Now, I want you to -- I mean, after

9  being a criminal defense lawyer for over 41 years, I wouldn't

10 waive a client's rights without saying, "Now, I want you to

11 understand that if we don't do such-and-such, it means this."

12 I mean, that's just automatic.

13 Q   Do you have -- do you have any specific recollection of

14 an occasion on which you discussed the waiver of appeal with

15 Mr. Pearson?

16 A   No.

17 Q   Okay.  At the time of sentencing, did you know that the

18 Government did not have to enforce a waiver of appeal if it

19 didn't want to?

20 A   The Government did not have to enforce a waiver of appeal

21 if it didn't want to?

22 Q   Did you know that at the time of sentencing?

23 A   I've never seen the Government not enforce waivers.  So

24 no, I did not.

25 Q   Okay.

1          MR. PAGE:  Just a moment.

2      (Pause.)

3          MR. PAGE:  I believe that's all I have.

4          THE COURT:  Cross-examination?

5          MR. BARTA:  Yes, Your Honor.

6                        CROSS-EXAMINATION

7   BY MR. BARTA:

8   Q   Mr. Taylor, just a little background information to start

9   with.  How long have you been a licensed attorney in the

10  State of Texas?

11  A   In May, May 15th, it'll be 42 years.

12  Q   What percentage of your practice is devoted to the

13  practice of criminal law?

14  A   I'd say between 50 percent and two-thirds.

15  Q   When Mr. Pearson retained you in this case, he contacted

16  you.  Is that correct?

17  A   Yes.

18  Q   Did he retain you for purposes beyond handling this

19  matter in the District Court?  In other words, did he retain

20  you at any point during your relationship to represent him in

21  an appellate matter?

22  A   No.

23  Q   When you met with Mr. Pearson after the sentencing, is it

24  your testimony that he did not during that meeting ask you to

25  file an appeal or a notice of appeal on his behalf?

1  A    That's right.  He didn't.

2  Q    And if he had asked you to do that, what would your

3  response to that request have been?

4  A    Quoted him a fee to do it.

5  Q    Did you quote him any fee to do that during that meeting?

6  A    No.  I didn't want to see Mr. Pearson spend his money

7  frivolously, and Mr. Pearson got the very minimum of the

8  Guidelines, with a downward departure, firstly.  And even

9  though the money would be going in my pocket, it's not right

10 for a lawyer to take money from a client when they are not

11 really -- don't see a reasonable possibility of helping the

12 client's situation.  Plus everybody -- nobody's brought this

13 up.  Mr. Pearson at the time of sentencing was 60 years old,

14 and if he -- you know, if he would have gotten 15 years of

15 supervised parole, or supervision after he got out of FCI,

16 he'd have still been 80 -- 75 or 80 years old.  I mean, just

17 I was happy that I felt like I had done Mr. Pearson a good

18 job.

19 Q    Again, for a moment setting aside the merits of any

20 possible appeal and just going back to the issue of whether

21 or not Mr. Pearson did or did not request you to file a

22 notice of appeal, even if you believed that there was no

23 basis to appeal but he had insisted that you do so, would you

24 have responded to his request?

25 A    If he had paid me to do it, of course.

1    Q    But you had not even a request that would have initiated

2    a discussion of any kind of a fee for handling an appeal

3    during that meeting that you had with Mr. Pearson after

4    sentencing or at any other time.  Is that correct?

5    A    That's correct.

6    Q    Now, sir, let's discuss for just a moment these two

7    polygraph appointments out in Las Colinas.  Am I correct,

8    sir, that during your transit to the first of those two

9    appointments, you had car trouble of some variety?

10   A    That's correct.

11   Q    Would you tell the Court about that, please?

12   A    I had a flat tire, and my spare, which I guess is my

13   fault, was a flat also.  So I had Donna, I got Donna involved

14   in it -- Donna being my office manager -- to try to call and

15   explain what the situation was, what my situation was.  That

16   was just unexpected.

17   Q    And was it that mechanical problem, is that the only

18   thing on that first occasion that stopped you from getting to

19   Las Colinas to at least try to find this building and attend

20   the polygraph?

21   A    Yes.

22   Q    Mr. Yanowitch and the agent did not refuse to give you a

23   second polygraph opportunity because you had appeared -- or

24   not appeared at the first one.  Is that correct?

25   A    That's correct.

1  Q   And you testified again that you had some difficulty

2  locating the building where this polygraph was to be given on

3  the day that occasioned the second polygraph.  Is that

4  correct?

5  A   That's correct.

6  Q   And that was from a simple matter of confusion about

7  directions and street locations and addresses in the Las

8  Colinas area, a geographic area that you were not personally

9  familiar with?

10 A   That's correct.

11 Q   When you did arrive at the scene of the polygraph, were

12 you told that your client had changed his mind about wanting

13 to submit to that polygraph examination?

14 A   I was.  Mr. Hudson told me that.

15 Q   Okay.  The Government had not refused on that occasion to

16 administer the polygraph; it was your client's decision, and

17 your client's decision alone, to put that polygraph off.  Is

18 that correct?

19 A   That's correct.

20      MR. BARTA:  Could I have just a moment, Your Honor?

21      THE COURT:  Okay.

22   (Pause.)

23      MR. BARTA:  That's all I have, Your Honor.

24      THE COURT:  Any redirect?

25      MR. PAGE:  Very briefly.

 1                        REDIRECT EXAMINATION

 2  BY MR. PAGE:

 3  Q    After the mechanical problem that occurred on the first

 4  polygraph meeting, did you make an effort to locate Las

 5  Colinas, the Las Colinas office?

 6  A    Yes.

 7  Q    And did you fail to do so?

 8  A    Sorry?

 9  Q    And did you succeed in doing so?

10  A    Yes.

11  Q    On the first occasion, did you make -- you arrived at the

12  Las Colinas building?

13  A    I don't understand the question.

14  Q    On the first occasion that the polygraph was scheduled,

15  did you ever succeed in locating the office building?

16  A    No.

17  Q    Okay.  You do not own a cell phone.  Is that correct?

18  A    I'm sorry?

19  Q    You do not own a cell phone.  Is that correct?

20  A    I do now own a cell phone.  A part of the reason that I

21  bought a cell phone or I got a cell phone --

22          THE COURT:  Mr. Taylor, did you have a cell phone

23  then?

24          THE WITNESS:  Do I have one now?

25          THE COURT:  Did you have one then?

1          THE WITNESS:  Then?  No.

2          THE COURT:  Okay.

3          MR. PAGE:  Okay.

4   BY MR. PAGE:

5   Q   If you had had a cell phone, could you have called

6   somebody to attempt to locate the building?

7          MR. BARTA:  I'm going to object to that.

8          THE COURT:  Sustained.

9          MR. PAGE:  All right.

10         THE COURT:  You're on the clock here, Mr. Page.

11         MR. PAGE:  Okay.  One last question.

12  BY MR. PAGE:

13  Q   Do you ever tell clients not to meet with government

14  agents without you there when they might talk about their own

15  criminal conduct?

16  A   Of course.

17  Q   Okay.  Thank you.

18         THE COURT:  All right.  May this witness be excused?

19  Mr. Barta?

20         MR. BARTA:  I'd like him to remain.  I don't think

21  we'll have to recall him, --

22         THE COURT:  All right.

23         MR. BARTA:  -- but just --

24         THE COURT:  Mr. Taylor, step down and adjourn to the

25  hallway, if you would, and we'll call you again if we need

1   you.   Thank you.

2        Call your next witness, Mr. Page.

3             MR. PAGE:   I call Mr. Pearson.

4             THE COURT:   Mr. Pearson, come forward.

5             RONALD C. PEARSON, PETITIONER'S WITNESS, SWORN

6                          DIRECT EXAMINATION

7   BY MR. PAGE:

8   Q   Mr. Pearson, who represented you in your criminal case?

9   A   Mr. Randy Taylor.

10  Q   How did you meet him?

11  A   I met him through a friend.  Well, it was my friend who

12  knew of him.  I don't know if Mr. Taylor knew him or not.  He

13  knew about him.

14  Q   Okay.  Do you have a recollection of a meeting with Mr.

15  Taylor immediately after you were sentenced?

16  A   Yes, I do.

17  Q   Okay.

18  A   Very definitely.

19  Q   Where did this meeting take place?

20  A   It took place in the little anteroom, if you want to call

21  it that, off of the courtroom.

22  Q   Okay.  Did you say anything to Mr. Taylor at that time?

23  A   Yes, I did.

24  Q   What did you tell Mr. Taylor?

25  A   Well, I told him that I was, you know, pretty devastated,

1  that I was very -- very disappointed, and that I definitely,

2  you know, wanted to appeal.

3  Q   How did he respond?

4  A   His response was that since I didn't receive, you know,

5  my original plea bargain, it was my understanding from him

6  and Mr. Falcon that as long as I was sentenced under the 20

7  years, which was the maximum, that I had no right to any kind

8  of an appeal.

9  Q   Okay.  Do you recall expressing satisfaction or

10 dissatisfaction with the term of supervised release?

11 A   No, I was devastated by that especially.

12 Q   Okay.  Did you express that to Mr. Taylor?

13 A   Yes, I did.

14 Q   Do you recall ever discussing your waiver of appeal in

15 your plea agreement before this meeting?

16 A   No, I don't think so.

17 Q   Okay.  And so you recall no consultation about the effect

18 of the waiver of appeal in your case?

19 A   I'm trying to think.  No, I don't believe so.

20 Q   Okay.  Did Mr. Taylor ever tell you that the Government

21 could, I guess, could choose not to enforce a waiver of

22 appeal?

23 A   I don't recall him making a remark like that.

24 Q   Do you recall getting the presentence report in this

25 case?

1   A    Oh, yes, I do.

2   Q    Okay.  Did the presentence report express any

3   dissatisfaction on your part with the Guideline calculations?

4   A    Yes.  I was just, you know, overwhelmed by the report.

5   You know, there were just things in there that I thought he

6   should have objected to.

7   Q    Do you recall what any of those were?

8   A    Well, one was the number of images.  To the day I die, I

9   will never believe that I had as many images as was stated,

10  especially the numbers of egregious images.  There were other

11  things.  I wish I had it here in front of me.

12       What I did, I wrote Mr. Taylor a letter, and I had

13  several paragraphs that were numbered the same as the

14  paragraphs in the PSR.

15  Q    Okay.  Do you recall telling him anything about the PSR's

16  conclusion that you should receive a higher Guideline range

17  because some of the images were sadomasochistic in nature?

18  A    Yes, I do.  And I also remember the part about the

19  supervised release, or lifetime supervision, I'm sorry, which

20  was very unsettling.

21  Q    Okay.  Did you express to him that you didn't believe

22  this adjustment to the Guidelines for sadomasochistic nature

23  should be applied to you?

24  A    I believe so, yes.

25  Q    Okay.  Did you -- did you have steady contact with Mr.

1   Taylor during the representation?

2   A    Yes.

3   Q    How many times did you meet with him?

4   A    It's hard to say, but I'd say maybe 20 times, something

5   like that, altogether.

6   Q    Okay.  Did you form an impression of his physical or

7   mental condition?

8   A    Not right at the very, very beginning.  But as time went

9   on, yes, most definitely.

10  Q    What was that impression?

11  A    That he was -- while, you know, he could be affable, he

12  -- also very erotic.  I'm sorry.  Erratic.  Very high-strung

13  and unpredictable, I think, is a good word.

14  Q    Okay.  Did you have an impression about his physical

15  condition?

16  A    Right in the very beginning, no.  But it became apparent

17  that he -- he looked bad.  He looked drawn.  He would forget

18  names, even names of people that -- like Mr. Yanowitch, for

19  example, that -- and he would also forget Agent Hudson's

20  name.  I mean, people who were really important players in

21  this.

22  Q    Umm, --

23  A    Forgetfulness, yes.  And then the irritability and, you

24  know, all kind of things, which got worse as time went on.

25  Q    Did he appear to be having difficulty remembering names

1   in other cases while you were present?

2   A    It seems like that he did, because I was -- a number of

3   times in his office, he would get phone calls and he would

4   speak with his office manager, Donna, and he'd said, "Oh,

5   yeah.  Who was that person?  I can't think of his name."

6   Etcetera, etcetera.  So, yes, I did notice that.

7   Q    Okay.  Do you recall any occasions on which he appeared

8   disoriented?

9   A    Very definitely.  On the second attempt at my polygraph

10  -- and I want to set the record straight on this, on these

11  sequences of events, too.  I don't want to ramble.

12  Q    Let me just --

13  A    All right.  Okay.

14  Q    Yeah.  Just tell me.

15  A    Yes.  He -- I saw him -- I had to go back.  I waited as

16  long as I could.  I went back to my home in Garland, phoned

17  his office, and his secretary had -- his office manager said

18  that he was there, finally, and that he had lost his vehicle.

19  So I went back.  And he was standing in front of the

20  building, walked to the car in an awkward gait, awkward

21  manner.  His -- he was obviously very disoriented, because we

22  tried to find his vehicle.  He was most concerned about that.

23  And he said, "Well, I believe it's down this way."  We went,

24  you know, a certain way.  It wasn't there.  And he said, "No,

25  I think it's..."  No, first of all, I said, "Well, do you

1   think it might be in a parking garage?"  And he said no and

2   that he did not.  Then we went in the opposite direction.  We

3   even crossed back over Highway 114 and looked down there.

4   And I asked him again about the parking garage, and he said,

5   "Yes, yes, I believe that it's, you know, in a parking

6   garage."  So we went back and looked in some -- some of

7   those, some of which were locked, locked up with a gate.  And

8   --

9   Q   Did you succeed in locating the vehicle that day?

10  A   No.  The bottom line is we never found it.

11  Q   Okay.  Tell me what happened on the first occasion, then,

12  when you were scheduled to take a polygraph.

13  A   Well, the first time we had a date set I was -- at that

14  time, I was just to meet him there.  And so I was there about

15  half an hour early.  And he didn't arrive at 9:00 o'clock.

16  That was the appointed time.  And so we waited and waited,

17  and he didn't show.  And I would say around -- maybe around

18  10:30, Agent Hudson was there but Mr. Yanowitch was not

19  there.  And Agent Hudson was on the phone with Mr. Yanowitch.

20  And he indicated to me that Mr. Yanowitch was suspecting

21  something was amiss, that maybe this was some ruse to get out

22  of me taking the polygraph.

23  Q   Okay.  Did he ever arrive that day in Las Colinas?

24  A   No.  He did not.

25  Q   Okay.  Did you reschedule the polygraph?

1  A    Yes.  It was rescheduled for roughly one month later.

2  Q    Okay.  What arrangements did you make with him to make

3  the second meeting?

4  A    The second time, I called him the night before and we

5  agreed to meet at a Denny's restaurant on I-30 as you

6  approach Garland from the northeast.  And I told him

7  specifically that if you take the Beltline Road exit to the

8  right, because you're going towards Dallas, and you have to

9  loop back around, not back around on the opposite side of the

10  freeway, but you had to cut through the shopping center in

11  order to get back to Denny's.  And he understood that.  And

12  then the agreement was that he would follow me.  I don't

13  remember if he was going to ride with me or if he was going

14  to follow me from Denny's.  At any rate, -- and we were to

15  meet at 8:00 o'clock.  And I arrived about 7:30, and he never

16  did show up.  So I called his office, and I believe it was

17  Mark Falcon who answered the phone and said, "Well, you know,

18  he's already left.  Is he not there?"  I said, "No, he's not

19  here."

20       So I waited approximately another 15 minutes.  I was

21  worried about traffic.  And so I proceeded on to Las Colinas.

22  And I arrived there, and we waited again, and Mr. Taylor did

23  not show.  I went upstairs --

24  Q    What time did you leave Las Colinas that day?

25  A    You mean to go back home?

1   Q    Yeah.

2   A    All right.  Okay.  Well, it was around -- around 2:00

3   o'clock in the afternoon.  Because I had lunch there.  They

4   said, "Well, go ahead and have lunch," which I did.  And as

5   -- so it was at least 2:00 o'clock.  I know that they were

6   walking out of the building.  Agent Hudson was walking out of

7   the building, so I walked out with him.

8   Q    Okay.  He -- you heard ...

9        (Omitted.  Tape change.)

10  A    ... 9:00 o'clock, and I didn't leave until 2:00 o'clock.

11  And I went home and phoned his office immediately and was

12  told by his office manager that he had finally arrived.  I

13  drove all the way back to Las Colinas and saw Mr. Taylor,

14  which I've already described.

15  Q    Okay.  Did you ultimately take the exam that day?

16  A    No, I did not.  I was going to take it, and I even signed

17  one of the forms, but there was something about the

18  situation.  I mean, this was the government who was using

19  their own polygrapher, and I was nervous, I was worried about

20  it, with my attorney not present.  I don't think anybody

21  would have taken a polygraph without their attorney present.

22  Q    Okay.  Mr. -- did Mr. Taylor's failure to show up

23  contribute to your decision not to take the polygraph?

24  A    Yes, definitely so.

25  Q    Okay.  Would you have taken the exam if he had shown up?

Pearson - Direct                          38

1   A    Yes, I would have.  I was ready to go.

2   Q    Okay.  Whose idea was the polygraph, to your

3   recollection?

4   A    Mr. Yanowitch.  After our -- my arraignment, I believe it

5   was last January, we met in an office in the district -- U.S.

6   Attorney's Office on the third floor.  And we had a meeting.

7   Mr. Yanowitch was there along with Agent Hudson.  And right

8   as we were concluding the meeting, Mr. Yanowitch mentioned

9   something about, "Well, you know, we need to get a polygraph

10  scheduled."  And that was the first time that was mentioned.

11  Q    Were you discussing cooperating at that time with the

12  Government?

13  A    Yes.  Definitely.

14  Q    Okay.  Did you think of the two issues as related?

15  A    Yes.  Absolutely.

16  Q    Okay.  Have you ever molested a child?

17  A    Absolutely not.  I want to make that clear.

18  Q    If somebody asked you that question, could you truthfully

19  deny it?

20  A    Yes.  I would truthfully deny it.

21  Q    Okay.  One last question.  Do you recall any occasions on

22  which Mr. Taylor lost his temper with you or behaved

23  impulsively?

24  A    Well, over the telephone a number of times, we were

25  talking.  And if I even acted like I was interrupting him,

1  you know, he would say, "Goddammit, Ron.  I wish you would

2  please stop interrupting me."  And that happened on several

3  occasions.

4      Of course, the biggest incident occurred after my re-

5  arraignment.  We were walking out of the building, and we

6  were on the sidewalk on Commerce Street, just right in front

7  of this building.  And I asked Mr. -- the question -- before

8  we had the re-arraignment, I was very concerned about my

9  monitor.  And I was --

10         MR. BARTA:  Your Honor, I'm going to object to this.

11  I think it's outside of the scope of anything that's relevant

12  to the motion here.

13         THE COURT:  Just go ahead and finish your testimony.

14         THE WITNESS:  Yes, sir.  I was, you know, concerned

15  about the monitor.  And I was told that the only individual

16  who could remove that monitor was the judge.  I asked Mr.

17  Taylor if -- because he had said that he would be meeting

18  briefly with the judge before the re-arraignment.  I asked

19  him if he would please just approach the subject about the

20  possibility of me having my monitor removed.  And I asked

21  this question, and he completely just blew up.  He yelled at

22  me and screamed and said that he wasn't going to talk to the

23  judge about anything.  The judge was too busy to worry about

24  things like that.  And this was in front of several

25  witnesses.  I mean, not -- not in my party, but others who

1   were walking down the street.

2   Q    Thank you.

3           MR. PAGE:  Pass the witness.

4           THE COURT:  Cross-examination?

5           MR. BARTA:  Yes, Your Honor.

6                       CROSS-EXAMINATION

7   BY MR. BARTA:

8   Q    Mr. Pearson, after you were sentenced and you met with

9   Mr. Taylor in what you described as an anteroom off of the

10  courtroom, did you directly tell him to file a notice of

11  appeal on your behalf?

12  A    Absolutely, yes.

13  Q    And what was his response?

14  A    His response was there is no appeal, that you weren't

15  sentenced to over 20 years, so therefore you're not entitled

16  to any kind of an appeal.

17  Q    And what was your response to that?

18  A    My response was I was kind of -- I believed him in some

19  way because that's what I thought was true, that if it

20  wasn't, you know, over 20, but I wanted him to at least, you

21  know, make an attempt.  I didn't realize that later on you

22  could at least file an appeal for your sentence.  And so that

23  was what I was getting at.

24  Q    Did you --

25  A    Not sentence.  You know, --

1    Q    Did you ever, at that or any other meeting after you were

2    sentenced, have a discussion with Mr. Taylor about retaining

3    him and paying him an additional fee to file or prosecute an

4    appeal on your behalf?

5    A    Absolutely not.

6    Q    And you had only retained him to represent you through

7    the trial of the matter?  You had never retained him before

8    that for any appellate matter?

9    A    That's correct, yes.

10   Q    After you knew that Mr. Taylor was going to take no

11   action to file an appeal on your behalf, did you do anything

12   else to perfect an appeal in this case?

13   A    Not immediately.

14   Q    Did you ultimately do something?

15   A    Well, I was concerned after I arrived in Seagoville.  I

16   began asking around, and you know, a lot of people said, no,

17   you know, you can appeal your sentence.  And so that's where

18   I started with the 2255.

19   Q    So that was based on inmate advice after you were already

20   incarcerated?

21   A    That's correct.

22   Q    But within the ten-day period after you were sentenced,

23   you did nothing else to try to perfect an appeal.  Is that --

24   A    No, I did not.

25   Q    When you were re-arraigned -- that is, in other words, at

1  the time you pled guilty -- you appeared before Magistrate

2  Judge Paul Stickney on May 29, 2007.  Is that correct?

3  A   If you say that's the date, that is correct.

4  Q   And at the beginning of that hearing, you were placed

5  under oath, just like you were placed under oath here today.

6  You swore to tell the truth, the whole truth, and nothing but

7  the truth.  Is that correct?

8  A   Yes, I was.

9  Q   And Magistrate Stickney specifically informed you that

10 any testimony you gave during the course of that hearing that

11 was not true could subject you to a perjury charge.  Is that

12 correct?

13 A   Absolutely.

14 Q   And is all of the testimony that you gave during the

15 course of that re-arraignment hearing the truth, the whole

16 truth, and nothing but the truth?

17 A   Yes.

18 Q   Okay.  Now, you testified that, before, you did not know

19 anything about the fact that you had waived your right to an

20 appeal in this case.  Is that correct?

21         MR. PAGE:  I'm going to object.  I think that

22 misstates the testimony.

23         THE COURT:  (indecipherable)

24 BY MR. BARTA:

25 Q   Well, did you realize, sir, that in your plea agreement

1   you had waived, in fact, your right to file an appeal in this

2   case?

3   A    I was very confused about the appeal process because

4   nobody ever explained it to me.

5   Q    Okay.  Did you read and understand your plea agreement

6   before you signed it?

7   A    Well, I read it, but I was in the frame of mind -- you

8   can just imagine, you know, reading something like that.  I

9   -- if it was an oversight, I apologize.

10  Q    Okay.  And then during the course of that hearing, when

11  you were under oath to tell the truth, the whole truth, and

12  nothing but the truth, the Court asked you, -- and I am on

13  Page 16, starting at Line 13, of the transcript.

14          THE COURT:  I don't expect I've got the re-

15  arraignment transcript.

16          MR. BARTA:  Okay.

17          THE COURT:  It's not among the documents that were

18  presented to me.

19          MR. BARTA:  All right.

20          THE COURT:  And I suspect the reason is because

21  nobody had challenged the waiver.

22          MR. BARTA:  Exactly, Your Honor.  May I proceed and

23  question him?

24          THE COURT:  Just get to the point.

25          MR. BARTA:  Okay.

1  BY MR. BARTA:

2  Q    The Court said, "You waived your right to appeal or

3  otherwise challenge your sentence, including bringing *habeas*

4  *corpus* petitions.  However, you have reserved the right to

5  bring a direct appeal of a sentence that exceeds the

6  statutory maximum, arithmetic errors in sentencing, to

7  challenge the voluntariness of your plea of guilty or this

8  waiver, and to bring a claim of ineffective assistance of

9  counsel.  You've also -- do you understand that you have the

10 right to appeal or otherwise challenge your sentence?"  And

11 you replied, "Yes."  Is that correct?

12 A    That's correct, yes.

13 Q    The Court went on to say, "And you will -- and you wish

14 to waive those rights, except in these limited

15 circumstances?"  And you replied, "Yes, Your Honor."

16 A    Yes.  That's correct.

17 Q    Now, when you want to Las Colinas on the first occasion

18 for the polygraph examination and Mr. Taylor did not appear

19 because of his car trouble, that was rescheduled?  There was

20 no prejudice to you on that occasion because Mr. Taylor did

21 not show up, correct?

22 A    Well, I think it looked a little funny that he wasn't

23 there, but yes, it was rescheduled.

24 Q    And on that second occasion, you decided based on what

25 you perceived your best interests to be that you did not want

1  to take that polygraph examination.  Is that correct?

2  A    That is correct.

3  Q    And that was in part after Mr. Yanowitch explained to you

4  that there could be negative implications to you if you were

5  not completely honest during the course of that polygraph

6  examination?

7  A    He made that comment, and he also said that, you know, it

8  would be a good thing also, you know.  So he gave both sides.

9  Q    And after hearing that, you decided it was not in your

10 best interest to take that polygraph examination at that

11 time?

12 A    Well, he made several statements, you know, not just that

13 one particular statement.  But no, without my attorney

14 present, I decided, no, this is -- this is not the thing to

15 do.

16 Q    At any time after that second occasion, did you request

17 of anyone to be allowed to take the polygraph examination?

18 A    I thought about it, but I never followed up on it.

19 Q    Never pursued it?

20 A    That's correct.

21       MR. BARTA:  Could I have just a moment, Your Honor?

22       THE COURT:  Yes.

23    (Pause.)

24       THE COURT:  Any redirect:?

25       MR. PAGE:  Very, very briefly.

 1                          REDIRECT EXAMINATION

 2   BY MR. PAGE:

 3   Q    Did you decline to take the polygraph examination because

 4   you were afraid of being prosecuted if you gave false

 5   information?

 6   A    I was -- I was not afraid, because the information I was

 7   going to give would not be false.

 8             MR. PAGE:  That's all.

 9             THE COURT:  You may step down.  Thank you.

10        (The witness steps down.)

11             THE COURT:  Call your next witness.

12             MR. PAGE:  Call Rex Smith.

13             THE COURT:  Go out in the hallway and get him.

14             MR. PAGE:  Thank you.

15        (Pause.)

16             REX SMITH, PETITIONER'S WITNESS, SWORN

17             THE COURT:  Have a seat up here, please.

18        You may proceed.

19                          DIRECT EXAMINATION

20   BY MR. PAGE:

21   Q    Please state your name.

22   A    Rex Smith.

23   Q    How long have you known the Defendant?

24   A    Over 50 years.

25   Q    I say the Defendant.  Is that Mr. Pearson?

1   A    Yes.

2   Q    Okay.  Were you in steady contact with him when his

3   criminal case was being decided?

4   A    Yes.

5   Q    Did he ever discuss an appeal with you?

6   A    Yes.

7   Q    What did he say?

8   A    He said that, if it came to that, that he wanted to make

9   sure that he did an appeal.

10  Q    Okay.  Was that before his sentencing?

11  A    Yes.

12  Q    Okay.  Do you recall any incident in which Mr. Taylor was

13  walking outside the court with you and Mr. Pearson?

14  A    Yes.

15  Q    What happened?

16  A    Ron and Mr. Taylor were talking, and then Mr. Taylor and

17  Ron, they raised their voices and they were upset.  I didn't

18  hear everything that was said, but they were both upset, and

19  it seemed like that Ron was wanting to do a certain thing and

20  Mr. Taylor said that that wasn't really what he wanted to do.

21  Q    Okay.  Did you have contact with Mr. Taylor throughout

22  the representation?

23  A    Yes.

24  Q    Did you form an impression of his physical and mental

25  condition?

Smith - Direct                                48

1   A    Yes.

2   Q    What was that impression?

3   A    I was concerned primarily about his physical state.  He

4   had told me on at least one occasion that he was needing to

5   get a liver transplant.  I went with Ron one time to his

6   office in East Texas, and at that point in time his physical

7   -- his color didn't look good at all.  And I don't know.  I

8   just didn't realize that his liver was affecting him as much

9   as it was or it seemed to be.

10  Q    Okay.  Thank you.

11          MR. PAGE:  Pass the witness.

12          THE COURT:  Cross-examination?

13          MR. BARTA:  No questions, Your Honor.

14          THE COURT:  Step down.

15      (The witness steps down.)

16          THE COURT:  Mr. Page, any further witnesses?

17          MR. PAGE:  No, Your Honor.

18          THE COURT:  Mr. Barta, any witnesses?

19          MR. BARTA:  Yes, Your Honor.  And I can do this one

20  of two ways.  There is one part of the Defendant's testimony

21  during his re-arraignment hearing that I forgot to ask him

22  about.  I can either just ask the Court to take notice of

23  that, or recall him briefly to do that.

24          THE COURT:  Just read it for the record.

25          MR. BARTA:  Okay.  I'm on Page 12 of the transcript

1   at this point, starting at Line 10.  (Reading)  The Court,

2   "Now, you have Mr. Taylor appearing here today with you as

3   your attorney.  I know that you've discussed the Sentencing

4   Guidelines.  Have you also discussed with Mr. Taylor the

5   facts and circumstances surrounding these charges?"  The

6   Defendant Pearson answers, "Yes, we have."  The Court says,

7   "And are you fully satisfied with the advice and

8   representation that he's given you in this matter?"  And the

9   Defendant Pearson answers, "Yes."

10      And just note that that occurred on May 29th, 2007, well

11   after the two polygraph events had taken place.

12      And I would call, Your Honor, Paul Yanowitch.

13            THE COURT:  Okay.  Mr. Yanowitch.

14            PAUL YANOWITCH, RESPONDENT'S WITNESS, SWORN

15            THE COURT:  You may be seated.

16      You may proceed.

17            MR. BARTA:  Thank you, Your Honor.

18                        DIRECT EXAMINATION

19   BY MR. BARTA:

20   Q   Would you state your full name and spell your last name

21   for the court reporter, please?

22   A   Paul Yanowitch, Y-A-N-O-W-I-T-C-H.

23   Q   Mr. Yanowitch, how are you currently employed?

24   A   I'm an Assistant U.S. Attorney in the U.S. Attorney's

25   Office in the Northern District of Texas.

1  Q    How long have you held that position?

2  A    I think it's been a little over four years.

3  Q    And were you employed by the Department of Justice before

4  you came to the Northern District of Texas?

5  A    Yes.  I've been an attorney for the Department of Justice

6  since 1986.

7  Q    And are you currently licensed to practice law?

8  A    I am.

9  Q    In what states?

10 A    Illinois.

11 Q    And are you also admitted to practice before the bar of

12 the Northern District of Texas?

13 A    Yes, I am.

14 Q    Were you the lead prosecutor against the Defendant in

15 this matter, Mr. Pearson?

16 A    (obscured by coughing)

17 Q    There has been testimony, Mr. Yanowitch, about a

18 polygraph examination.  What was your purpose in seeking a

19 polygraph examination for Mr. Pearson?

20 A    Mr. Pearson, after he had been confronted by the agents

21 and indicted, agreed to come in under a proffer agreement and

22 to talk to us and cooperate.  And in that process, one of the

23 things that I was very concerned about was whether, given the

24 nature of the charges and the nature of the evidence we

25 found, whether Mr. Pearson had in fact any contact with

1  children of a sexual nature, whether -- did he have any

2  molestation or anything.  And that was a very important part

3  of his cooperation.  And I -- he asked repeatedly about that.

4  Special Agent Hudson, Brad Hudson, from Vice and I repeatedly

5  questioned Mr. Pearson about that, and he consistently

6  vociferously denied ever molesting any children.  And so I at

7  that point asked him whether he was willing to take a

8  polygraph, because even though it was under a proffer, my

9  sense was it was much more important to find out, even if I

10  couldn't prosecute him for it, it was much more important to

11  find out if he had actually molested any children, for me to

12  try and rescue those children or get them appropriate help

13  than it was to prosecute him.

14     So the polygraph, to my recollection the polygraph was my

15  idea, principally designed as a means of ensuring accuracy in

16  his results and most specifically the accuracy and

17  truthfulness of his responses regarding his prior sexual

18  contact with children.

19  Q   And was the ultimate purpose of all of those

20  determinations to decide whether or not to tell the District

21  Court that he had cooperated and to file a motion under

22  Section 5(k)(2) or 5(k)(1) of the Guidelines asking for a

23  downward departure from his Guideline range in this case?

24  A   Yes.

25  Q   Now, on the first occasion that this polygraph was

Yanowitch - Direct                              52

1   scheduled, Mr. Taylor did not show up.  Is that correct?

2   A    My recollection is he did not -- my understanding is he

3   did not -- he certainly did not show up at the time

4   appointed, nor at any time during work hours.

5   Q    And did that in any way prejudice Mr. Pearson?

6   A    No.  I specifically told Mr. Pearson, I believe, or -- I

7   believe I told Mr. Pearson at some point that I wasn't going

8   to hold the failure of his counsel to show up against him, so

9   that I would allow him to reschedule, that he'll have another

10  opportunity, and he did in fact reschedule the polygraph.

11  Q    Tell the Court what happened on that second rescheduled

12  occasion.

13  A    To the best of my recollection, -- the polygraph was

14  rescheduled -- in each case was scheduled for 9:00 o'clock.

15  They have to start somewhat early because you have to give a

16  series of them and add them to a point in time.  There's just

17  not enough time in the day to do them.  It started at 9:00.

18  I believe I was there at that point, Special Agent Hudson and

19  I.  And we waited.  After a while, Mr. Pearson showed up, and

20  we waited and we waited.  And I think, not positive, but

21  several hours later, I think around lunchtime or maybe a

22  little bit before that, at some point that morning, you know,

23  we basically gave Mr. Pearson a choice.  You know, it's now

24  or never.  Given the amount of time it's going to take to do

25  the series of polygraphs, we'd either have him take it or

1    we'd call it off.  It's your choice.  And I tried to give him

2    all the warnings and -- attendant with that.  And I gave him

3    every right not to take it because his lawyer wasn't there,

4    and all that.  And at some point, Mr. Pearson said, "I'm

5    going to go ahead."  And he began to take the polygraph, and

6    he was -- he went into the room with the polygrapher, and the

7    polygrapher gave him more warnings, and I believe I gave him

8    more warnings, and he started to answer a series of questions

9    as an antecedent to the polygraph, the normal questions a

10   polygrapher asks.  And he decided at that point he wasn't

11   going to do anything, and he left.

12       And soon after that, I left.  And Mr. Pearson and I

13   talked for a little bit, and then we -- then I think we both

14   left.  And I think that was around lunch time.  And at that

15   point, Mr. Taylor had not appeared, but I understand he

16   appeared maybe about an hour later.  I was called by Special

17   Agent Hudson.

18   Q   Did ultimately his failure to take that polygraph on the

19   second occasion or any subsequent occasion prejudice Mr.

20   Pearson?

21   A   Not in any way that I can, you know, -- no, I don't

22   believe it did.  I did not have any evidence that Mr. Pearson

23   had molested anybody.  I did not apprise the Court at any

24   time that he failed to cooperate.  Indeed, I gave him, I

25   think, a very, very healthy Section 5(k)(1.1) downward

1   departure based upon information that he had given us about

2   another individual who I thought was somewhat dangerous to

3   the community.  So, I mean, I think I gave him a very

4   generous 5(k)(1.1) regardless.

5   Q   And would you have given him any better 5(k)(1.1) motion

6   had he taken and passed that polygraph examination?

7   A   Not based upon -- you know, if he had taken a polygraph

8   and said, "No, I never molested a child," that would have

9   ensured me that his answers were correct and made me feel

10  better about dealing with him, but it would not have given

11  him any extra points.  I think he had a five point 5(k),

12  five-point downward departure.

13  Q   During the sentencing hearing, Mr. Pearson presented an

14  expert witness about his danger to the community, and you

15  cross-examined that expert witness to some extent about his

16  lack of having a polygraph test to base his findings on.  Is

17  that correct?

18  A   That's correct.

19  Q   Is that the same polygraph test that you were going to

20  administer, or were you talking about a different type of

21  polygraph examination?

22  A   In my mind, I was talking about a somewhat different

23  polygraph.  It's my understanding based upon my review of the

24  literature that -- and what I was questioning Dr. Lewis about

25  was the extent to which one could rely upon answers from

 1    defendants who've been accused of child exploitation crimes

 2    and child pornography, the extent to which one could rely

 3    upon their responses without polygraphing them about their

 4    sexual history.  Specifically -- and I won't belabor it, Your

 5    Honor -- the question -- one of the questions was Dr. Lewis'

 6    opinion about Mr. Pearson's danger to the community.  And he

 7    was relying in part upon the fact that Mr. Pearson -- there

 8    was no evidence that he molested anybody and there was no

 9    history of any deviate sexual behavior and the like.  And my

10    cross-examination, if I recall correctly, and I won't claim

11    it was articulate, was along the lines of:  Isn't it true

12    that your sense, your understanding of his prior sexual

13    history is very limited in light of the fact that you have

14    not given him a sex history polygraph?

15        A sex history polygraph, my understanding, goes very

16    detailed into a person's sexual history.  Their relations,

17    how many relations, with whom, under what circumstances,

18    throughout their basic adult life, if not prior.

19        I was not -- my understanding of the polygraph we were

20    going to administer to Mr. Pearson had essentially one or two

21    control questions, or one or two -- I'm sorry -- one -- I

22    misspoke.  One or two relevant questions, as it were, besides

23    the basic control questions.  And one of them was going to

24    be, have you had sexual -- inappropriate sexual contact with

25    a minor?  That was it.  We were not going to delve into the

1  history of it.

2  Q   So is it fair to conclude that you would have given the

3  same cross-examination to that expert witness even if the

4  polygraph that you wanted to administer had in fact been

5  given?

6  A   Yes, assuming that Mr. Pearson's response had -- the

7  polygraph had come back as valid, yes.

8          MR. BARTA:  That's all I have, Your Honor.

9          THE COURT:  Cross-examination?

10                         CROSS-EXAMINATION

11 BY MR. PAGE:

12 Q   To be clear, the polygraph that you were going to give

13 Mr. Pearson would have asked him about his sexual history?

14 A   No, I -- I'm sorry.  If it was the polygraph we were

15 going to ask him about, it was not going to ask him about any

16 detailed sexual history.

17 Q   Well, but it was going to ask him about some general

18 sexual history -- specifically, whether he had molested

19 children.  Right?

20 A   I believe we had only two or three relevant -- two

21 questions that we could basically put to him in a polygraph.

22 The critical questions.  And one of them was going to be --

23 and I don't know if I'm phrasing it correctly from my memory

24 -- but it's along the lines of "Have you ever had

25 inappropriate sexual history -- inappropriate sexual contact

1  with a minor?"

2  Q   Okay.  And if he had taken and passed that polygraph,

3  whether your questions would have been the same to Dr. Lewis,

4  his answers may have been different.  Correct?

5  A   Dr. Lewis'?

6          MR. BARTA:  I'm going to object.  That calls for

7  speculation, Your Honor.

8          THE COURT:  Sustained.

9          MR. PAGE:  Okay.  Thank you.  That's all.

10          THE COURT:  You may step down.

11          THE WITNESS:  Thank you.

12     (The witness steps down.)

13          MR. BARTA:  I have nothing further, Your Honor.

14          THE COURT:  Rebuttal evidence?

15          MR. PAGE:  No, sir.

16          THE COURT:  I don't need to hear arguments.  I do

17  have a couple of questions for both sides.

18     Mr. Barta, it is not the Government's contention, or is

19  it, that the waiver of the right to an appeal of the

20  Government, though, is not being challenged in this

21  proceeding?  It deprives him of the opportunity to -- he

22  could still -- and has a right to appeal his conviction?

23          MR. BARTA:  That is correct, Your Honor.

24          THE COURT:  Okay.  And if he told his attorney that

25  he wanted to file an appeal and his attorney did not file an

1  appeal, that would constitute ineffective assistance of

2  counsel, entitling him to an out-of-time appeal.  Is that

3  right?

4          MR. BARTA:  If he made an absolute and unequivocal

5  statement, yes, I would agree with that.

6          THE COURT:  All right.

7     Mr. Page?

8          MR. PAGE:  Yes, Your Honor?

9          THE COURT:  A couple of preliminary matters before I

10 tell you what I'm going to do in this case.  I ordered your

11 client, who was represented by retained counsel throughout

12 his criminal trial, to file a financial affidavit.  Was that

13 done?

14         MR. PAGE:  From my conversations with Mr. Pearson,

15 he did fill one out and send it.  And I don't know if it's

16 been received.

17         THE COURT:  But have you seen it?

18         MR. PAGE:  I have not.  I tried to --

19         THE COURT:  Vila, do we have one?  Our records don't

20 show that it has been received.  That doesn't mean he didn't

21 send it in.  That just means we don't have one.

22         MR. PAGE:  Okay.

23         THE COURT:  My concern is -- well, let me tell you

24 what I'm going to do.  I believe Mr. Pearson.  I think he

25 told Mr. Taylor to file an appeal and he didn't.  And my

1    reasons for that will be detailed in a recommendation.  So

2    I'm going to give him an out-of-time appeal.  But I'm not

3    sure I'm going to appoint a lawyer to represent him on

4    appeal, because based on the financial information that's in

5    the probation report, the presentence investigation report,

6    he's got a net worth of $128,000.

7        Now, I understand that the stock market's a little

8    different today than it was then.  But I'm going to tell Mr.

9    Pearson:  We're going to do a detailed investigation into

10   your resources.  You have no living expenses.  So my guess is

11   that if you want to appeal this, you're going to have to pay

12   a lawyer to handle it for you.

13       Now, that said, Mr. Page, you have a long and hard

14   discussion with Mr. Pearson about what issues, if any, he

15   could raise on appeal if the Government, which I suspect it

16   will, will --

17            MR. BARTA:  Yes, Your Honor.

18            THE COURT:  -- will move to enforce the waiver.  So,

19   although he's got a right to an appeal, and I'm going to give

20   him that right if he wants to prosecute it -- and if he's

21   destitute and doesn't have the money, we'll appoint a lawyer

22   to represent him -- but he may well end up exhausting

23   whatever financial resources he has to prosecute an appeal

24   that may ultimately end up being frivolous.  But that's not

25   for me to decide.  That's for Mr. Pearson to decide in

1    consultation with his lawyer.

2        I'm rejecting the other claims as not supported by the

3    evidence.  And a recommendation will issue to which the

4    parties may --

5        Anything further from the Defendant in this case?

6            MR. PAGE:  No, Your Honor.

7            THE COURT:  From the Government?

8            MR. BARTA:  No, Your Honor.

9            THE COURT:  All right.  The parties are excused.

10   Court is adjourned.

11       (Proceedings concluded.)

12                            --oOo--

13

14

15

16

17                        CERTIFICATE

18       I certify that the foregoing is a correct transcript to

19   the best of my ability from the electronic sound recording,

20   without log notes, of the proceedings in the above-entitled

21   matter.

22

23   _____        _____

24   Kathy Rehling                           Date
     Certified Electronic Court Transcriber
25   CET**D-444

1                                   INDEX

2

PROCEEDINGS                                                     2

3

4   WITNESSES

5   Petitioner's Witnesses

6
    Randy Taylor
7   - Direct Examination by Mr. Page                           4
    - Cross-Examination by Mr. Barta                          24
8   - Redirect Examination by Mr. Page                        28

9   Ronald C. Pearson
    - Direct Examination by Mr. Page                          30
10  - Cross-Examination by Mr. Barta                          40
    - Redirect Examination by Mr. Page                        46

11
    Rex Smith
12  - Direct Examination by Mr. Page                          46

13
    Respondent's Witnesses
14  - Direct Examination by Mr. Barta                         49
    - Cross-Examination by Mr. Page                           56

15

16  EXHIBITS

17
    RULING                                                    58
18

19  END OF PROCEEDINGS                                        60

20
    INDEX                                                     61
21

22

23

24

25